**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 23-cv-23654-BLOOM/Torres**

RICHARD C. MURPHY, III; and
KATHLEEN T. MURPHY

    Plaintiffs,

        vs.

AIRWAY AIR CHARTER INC.
d/b/a Noble Air Charter; VENTURE
AIR SOLUTIONS, INC.;
ALEX GUTIERREZ, individually; and.
ATLANTIC AVIATION – OPA LOCKA
LLC d/b/a Atlantic Aviation,

    Defendants.

_____/

**OMNIBUS ORDER ON MOTIONS FOR SUMMARY JUDGMENT, *DAUBERT*
MOTIONS, AND MOTION TO STRIKE**

    **THIS CAUSE** is before the Court upon five separate motions: (1) Defendant Atlantic

Aviation – Opa Locka, LLC's ("Atlantic") Motion for Summary Judgment ("Atlantic's Summary

Judgment Motion"), ECF No. [68]; Plaintiffs Richard Murphy and Kathleen Murphy ("Plaintiffs")

filed a Response in Opposition, ECF No. [84], to which Atlantic filed a Reply, ECF No. [94]; (2)

Plaintiffs' Motion for Partial Summary Judgment, ECF No. [71] ("Plaintiffs' Summary Judgment

Motion"); Defendants Airway Air Charter, Inc. ("Noble") and Alex Gutierrez ("Gutierrez") filed a

Response in Opposition, ECF No. [88], to which Plaintiffs filed a Reply, ECF No. [91]; (3)

Atlantic's Motion to Exclude Opinions and Testimony from Plaintiffs' Expert Mark A. Pottinger

("Atlantic's *Daubert* Motion"), ECF No. [78]; Plaintiffs filed a Response in Opposition, ECF No.

[87], to which Atlantic filed a Reply, ECF No. [96]; (4) Plaintiffs' Motion to Strike Charter

Defendants' Rebuttal Experts, ECF No. [80] ("Plaintiffs Motion to Strike"); Defendants Noble and

Gutierrez (collectively the "Charter Defendants") filed a Response in Opposition, ECF No. [89], to which Plaintiffs filed a Reply, ECF No. [93]; and (5) Charter Defendants' Motion to Exclude or Limit Expert Testimony of Mark A. Pottinger ("Charter Defendants' *Daubert* Motion"), ECF No. [81]; Plaintiffs filed a Response in Opposition, ECF No. [86], to which Charter Defendants filed a Reply, ECF No. [98].

The Court has reviewed the Motions, the supporting and opposing submissions,[1] the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, Plaintiffs' Summary Judgment Motion is granted; Atlantic's Motion for Summary Judgment is denied; Atlantic's *Daubert* Motion is granted; Charter Defendants *Daubert* Motion is granted in part and denied in part; and Plaintiffs' Motion to Strike is granted in part and denied in part.

## I. BACKGROUND

Plaintiffs originally filed this action against Defendants Airway, Gutierrez, and Venture Air Solutions, Inc. on April 25, 2022, in the Circuit Court for the Eleventh Judicial Circuit for Miami-Dade County, Florida, styled *Murphy v. Airway Air Charter, Inc. et al*, Case No.: 2022-007616-CA-01. Atlantic thereafter removed this case based on federal question and admiralty jurisdiction pursuant to 28 U.S.C. §§ 1331, 1333, 1441, and 1446. *See* ECF No. [1]. Once removed, Plaintiffs filed their Fourth Amended Complaint on December 22, 2023, ECF No. [37]. The Fourth Amended Complaint alleges Airway (Count I) and Gutierrez (Count II) are liable for Murphy's injuries under

---

[1] Atlantic filed a Statement of Undisputed Material Facts in Support of its Summary Judgment Motion. *See* ECF No. [69] ("ASMF"). Plaintiffs filed a Response to Atlantic's ASMF and Additional Facts in Opposition to Summary Judgment, ECF No. [85] ("PSAMF"). Atlantic filed a Reply Statement of Material Facts and Response to Plaintiffs' Additional Facts, ECF No. [95] ("RPSAMF"). Plaintiffs also filed a Statement of Undisputed Material Facts in Support of their Summary Judgment Motion. *See* ECF No. [72] ("PSMF"). Charter Defendants did not file a Response to the PSMF. The Court accordingly deems facts not genuinely disputed by either Plaintiffs or Atlantic as admitted by Charter Defendants for purposes of the Parties' Summary Judgment Motions. *See* S.D. Fla. L.R. 56.1(c) (generally, "[a]ll material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's statement of Material Facts[.]").

Article 17 of the Warsaw Convention.[2] *Id.* ¶¶ 22-35. Count IV alleges a negligence claim against Atlantic Aviation for failing to properly fuel the subject aircraft. *Id.* ¶¶ 36-42.

### A. Material Facts

Based on the Parties' briefings and the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.

On January 5, 2022, Plaintiff Richard Murphy ("Murphy") was the sole passenger aboard the subject aircraft, a 1977 Cessna 402B, Registration No. N145TT (the "Aircraft"), departing from Miami, Florida with an intended destination of Chub Cay, The Bahamas. PSMF ¶ 1; ASMF ¶¶ 1-2; PSAMF ¶ 1. Noble issued Plaintiff a passenger ticket for the subject flight, *see* ECF No. [71-8], which contained the following Limitation of Liability provision:

> Limitation of liability: Charter company shall not be liable for any injury, damage, loss, expense, indirect, incidental, special, consequential, punitive or exemplary damages (including, but not limited to, damages for loss of use, lost profits or diminution in value) whether in contract or tort (including strict liability and negligence), or other irregularity caused by the defect of any vehicle or conveyance, or the negligence of any company or person engaged in conveying the passenger or carrying out the arrangements for customer's trip or by accident, delay, flight schedule, change, cancellation, sickness, weather, strike, war, pandemic, force majeure, governmental action, quarantine, or any similar cause. Charter company's liability shall in any case be limited to the amount paid to it, and any claim shall be adjudicated in and governed by the laws of the state of Florida.

*Id.* ¶ EE (the "Limitation of Liability").

The Aircraft is owned by Defendant Venture Air Solutions, Inc. and was operated by Noble. PSMF ¶ 4. Atlantic fueled the Aircraft on the morning of the subject flight. ASMF ¶ 2; PSAMF ¶ 2. Gutierrez piloted the Aircraft. PSMF ¶ 1; ASMF ¶ 1. Gutierrez testified that he "knew that [he]

---

[2] Count III alleges a vicarious liability and loss of consortium claim against Defendant Venture Air Solutions, Inc ("Venture"). The Court previously granted Venture's unopposed motion for summary judgment on Count III. *See* ECF No. [66].

was going to be going and coming, simple round trip, spending the day at Chub [Cay] and coming back." ECF No. [84-6] at 25.

The Aircraft crashed into the ocean before reaching its destination. PSMF ¶ 1; ASMF ¶ 21; PSAMF ¶ 21. Plaintiffs' accident reconstruction expert, Mark Pottinger ("Pottinger"), opined that the Aircraft most likely experienced dual engine failure, which "was most probably the result of fuel starvation when the pilot mismanaged available fuel by operating on the main fuel tanks until the fuel in those tanks was depleted." ECF No. [89-3] at 17. Plaintiff suffered severe injuries, including spinal fractures. PSMF ¶ 3.

The Aircraft was fueled with 66.5 gallons of 100LL "avgas" on the morning of the flight. ASMF ¶ 3; PSAMF ¶ 3; *see* ECF No. [69-2]. The Aircraft's fuel system "consists of two main tanks, two optional auxiliary tanks, two optional wing locker tanks, fuel selections for selection of main, auxiliary or crossfeed fuel and other necessary components to complete the system." ECF No. [84-4]. "The main tanks are integrally sealed (wet) aluminum tanks mounted on each wing tip." *Id.* "The optional auxiliary tanks are … bladder-type cells between the spars in the outboard wing." *Id.* This multi-tank fueling system is visually represented below:



*See id.*

The Parties dispute whether the main tanks or the auxiliary tanks were filled. Gutierrez emailed Atlantic on January 4, 2022 requesting that the main tanks be filled. *See* ECF No. [84-7] (requesting "35/Left Main & 30/Right Main" for the Aircraft). Atlantic's customer service representative, Aaliyaha Stewart, confirmed receipt of the request later that day. *See id.* ("Your departure and fuel requests have been well received."). The Aircraft was fueled by Atlantic's line service technician Anthony Rizzo ("Rizzo"). Rizzo testified that Gutierrez requested a different fuel amount shortly before fueling:

Q. Was he [Gutierrez] at the aircraft with you?

A. At the initial part of the beginning of the fueling, yes.

Q. He didn't stay with you during the entire fueling?

A. No.

Q. And what did you and he talk about at the time he came out and met with you initially?

A. I just remember him telling him the fuel request I had for him in the system. And then I remember he needed – he wanted a different fuel amount. I confirmed with him.

Q. I'm sorry. He wanted what?

A. He requested a different fuel amount than what I had in my system. And then I confirmed that with him.

Q. All right. Let's go back. How many gallons of fuel were you to put in the plane?

A. For the initial fuel request?

Q. Yes.

A. It was 30 gallons on either the left or the right side. I don't exactly remember. And 35, vice versa. Left or right side, I don't exactly remember.

Q. Okay. And what did he change it to?

A. I don't recall.

ECF No. [84-3] at 34-35. Rizzo later explained he could not recall the updated fuel order he received from Gutierrez that morning:

> Q. And what did you and Mr. Gutierrez talk about when he got out to the aircraft – out to the fuel tank truck and you?
>
> A. I remember telling him my fuel order that I have in the system, and I wanted to confirm that with him before the fueling. And then I remember him saying that he needed a different fuel order. I confirmed that with him as well. And then that was about all I remember from our conversation.
>
> Q. Did he tell you at what tank you were to put the fuel?
>
> A. I don't remember.
>
> Q. Do you remember in what tanks you put the fuel?
>
> A. I don't remember.
>
> Q. Do you recall receiving any instructions from anyone on that morning as to where the fuel was to be placed?
>
> A. Yes, in my fuel order that I had on my system.
>
> Q. Okay. What does the fuel order say?
>
> A. The main tanks.
>
> Q. The main tanks. And where are the main tanks located?
>
> A. They are on the wing. They are not the tip tanks.
>
> Q. They're on the wing –
>
> A. Yes.
>
> Q. -- is that right?
>
> A. Yes.
>
> Q. And is that what you refueled as one of the tip tanks -- I mean, were the wing tanks?

A. I don't exactly remember. Like I said, he switched up his fuel order. I don't remember what that was, so I don't remember.

Q. I'm confused. Your fuel order said to put it in the main tanks?

A. Yes.

Q. And did the fuel order tell you which main tank was to the get the majority of the fuel or how it was to be divided?

      MS. MELVANI: Objection to form.

      THE WITNESS: I don't remember.

      BY MR. PARKS:

Q. But you do remember that the main tanks are in the wing?

A. Yes.

Q. And that's what you refueled on that morning?

A. Like I said, [Gutierrez] – he switched up his fuel order. The one that I had said – yes, the main tanks. What he asked to switch it to, I don't remember.
Q. Did he tell you to switch the tanks?

A. Yes. Well, no, he told me to switch the fuel order. That's – I don't remember what tanks it was or the actual order.

*Id.* at 40-42.

Gutierrez testified that the fuel was supposed to be placed in "the main tanks, which are the tip tanks for that particular model." ECF No. [84-6] at 16. Gutierrez also testified that he was at the airport but was *not* planeside during fueling. *See id.* at 17 ("Q. Did you personally observe the aircraft being fueled? A. No."). However, Gutierrez further testified that he conducted a pre-flight check and physically inspected the fuel tanks before takeoff:

Q. Did you make such a [pre-flight] check at that time?

A. Yes. I did a pre-flight prior to being fueled. I did a pre-flight after being fueled. I did a pre-flight prior to starting the engine. And I did my pre-flight after starting the engine, prior to departure.

Q. Did you, at any time prior to starting the engines, did you get out and check the fuel manually?

A. When we got in the plane, Mr. Murphy and I were in the plane, I turned on the batteries, all the indication instruments came up. And I decided that I wanted to check the fuel one more time before we took off to make sure that I had adequate fuel. Which I got off, I checked the fuel visually in both tip tanks. Fuel was adequate. It was where I needed it to be for the flight, for the round trip flight, plus the reserve. And I got back in the plane and started the engine.

*Id.* at 31-32.

Regarding his interactions with Rizzo, Gutierrez testified "I did not tell [Rizzo] that the fuel was low. I told him that I wanted to verify that the fuel was correct, as it was indicating that the tanks were not totally full, and I wanted to verify that the fuel gauge was indicating the amount of fuel that was actually in the tip tanks." *Id.* at 34. Gutierrez explained he then exited the Aircraft to visually expect the main tanks, or "tip tanks," to confirm they had adequate fuel. *See id.* at 35. Gutierrez testified that he "visually looked into" both main tanks, observed "[t]hey were not overflowing[,]" but that they nonetheless "were where they should be for the amount of fuel that the gauges were indicating." *Id.*  Video footage captures the Aircraft being fueled that morning, but it is unclear which tanks were fueled. *See* ECF No. [78-3]. Pottinger opines that "[o]n close examination of the aft ramp video, it is evident the right auxiliary (wing) tank was fueled and the right main (tip) was not." ECF No. [71-6] at 17. Atlantic's expert, David Stimson ("Stimson") disagrees with this conclusion but does not specify which tanks were fueled. *See generally* ECF No. [84-8] at 2.

Gutierrez's fuel request includes a disclaimer that reads "***CAPTAIN FROM NOBLE OR NOBLE PERSONNEL NEED TO BE PLANE SIDE FOR FUELING**". *See* ECF No.

[84-7] (emphasis in original). Noble's Chief Pilot and Director of Operations, Juan Aristizabal ("Aristizabal"), testified that Noble has a policy that pilots are to remain planeside during fueling, "but not at the base." ECF No. [95-1] at 43. Aristizabal explained "[i]n Opa Locka, [pilots] don't have to be next to the plane waiting for fuel. That is ideal, but it sometimes takes five hours to fuel the airplane. We come, and we never know when they're going to show up." *Id.* at 43-44. Instead, Noble's pilots typically "order [the fuel] the night before we leave … [n]ext morning we show up preflight" and verify the plane was properly fueled. *Id.* at 44.

## II. LEGAL STANDARD

### A. Summary Judgment

A party may obtain summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Further, the Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once this burden is

satisfied, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 Fed. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. Even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

### B. *Daubert* Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony. When a party proffers the testimony of an expert under Rule 702, the party offering the expert testimony bears the burden of laying the proper foundation, and that party must demonstrate admissibility by a preponderance of the evidence. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). To determine whether expert testimony or any report prepared by an expert may be admitted, the Court engages in a three-part inquiry, which includes whether: (1) the expert is qualified to testify competently regarding the matters the expert intends to address; (2) the methodology by which the expert reaches his or her conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562

(11th Cir. 1998) (citing *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). The Court of Appeals for the Eleventh Circuit refers to each of these requirements as the "qualifications," "reliability," and "helpfulness" prongs. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). While some overlap exists among these requirements, the court must individually analyze each concept. *See id.*

Under *Daubert*, a district court must take on the role of gatekeeper, but this role "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech.*, 326 F.3d at 1341 (citations omitted) (quotation marks omitted). Consistent with this function, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). "[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech.*, 326 F.3d at 1341 (citations omitted) (quotation marks omitted). Thus, the district court cannot exclude an expert based on a belief that the expert lacks personal credibility. *Rink*, 400 F.3d at 1293 n.7. On the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596). "Thus, '[o]n cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility.'" *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)). Ultimately, as noted, "a district court enjoys 'considerable leeway' in making" evidentiary determinations such as these. *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1103 (11th Cir. 2005) (quoting *Frazier*, 387 F.3d at 1258).

### C.  Expert Disclosures

Federal Rule of Civil Procedure 26 requires a party to disclose to the other parties the identity of any witness it may use at trial to present expert testimony. *See* Fed. R. Civ. P. 26(a)(2). To properly disclose a retained expert, parties must disclose an expert's identity "accompanied by a written report." *Id*. at Rule 26(a)(2)(B). If the witness is not required to provide a written report, the party must disclose the subject matter on which the witness is expected to present evidence and a summary of the facts and opinions the witness is expected to testify to. *Id*. at Rule 26(a)(2)(C).

If a party violates Rules 26(a), Rule 37(c) provides for the exclusion of the expert evidence "unless the failure was substantially justified or is harmless." *See id.* at Rule 37(c)(1). The non-disclosing party bears the burden of showing that the failure to comply with Rule 26 was substantially justified or harmless. *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009). In making this determination, the Court considers four factors: "(1) the importance of the excluded testimony; (2) the explanation of the party for its failure to comply with the required disclosure; (3) the potential prejudice that would arise from allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *Torres v. First Transit, Inc.*, No. 17-CV-81162, 2018 WL 3729553, at *2 (S.D. Fla. Aug. 6, 2018) (citation omitted). "Prejudice generally occurs when late disclosure deprives the opposing party of a meaningful opportunity to perform discovery and depositions related to the documents or witnesses in question." *Bowe v. Pub. Storage*, 106 F. Supp. 3d 1252, 1260 (S.D. Fla. 2015) (citation omitted).

Ultimately, the "determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Smith v. Jacobs Eng'g Grp., Inc.*, No. 06-CV-496, 2008 WL 4264718, at *6 (N.D. Fla. Mar. 20, 2008), *report and recommendation adopted*, No. 06-CV-496, 2008 WL 4280167 (N.D. Fla. Sept. 12, 2008) (citation omitted); *Warren*

*v. Delvista Towers Condo. Ass'n, Inc.*, No. 13-CV-23074, 2014 WL 3764126, at *2 (S.D. Fla. July 30, 2014) (noting that a court has "great discretion in deciding whether to impose such a sanction" for failure to comply with expert witness disclosure requirements). Indeed, "[c]ourts have broad discretion to exclude untimely expert testimony—even when they are designated as 'supplemental' reports." *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 718 (11th Cir. 2019).

### D.  Warsaw Convention/Montreal Convention

The Warsaw Convention was signed in 1929 with a goal to "achieve uniformity of rules governing claims arising from international air transportation."[3] *Eastern Airlines v. Floyd*, 499 U.S. 530, 552 (1991). In 1999, fifty-two countries, including the United States, signed the Montreal Convention, "a treaty to replace the Warsaw Convention."[4] *Eli Lilly & Co. v. Air Exp. Int'l USA, Inc.*, 615 F.3d 1305, 1308 (11th Cir. 2010); *see Jacob v. Korean Air Lines Co.*, No. 12–62384-CIV., 2014 WL 243150, *19 (S.D. Fla. 2014) ("The Montreal Convention became effective in the United States on November 4, 2003, updating and replacing the uniform system of liability for international air carriers previously established by the Warsaw Convention.").

Courts accordingly rely on cases interpreting the Warsaw Convention "where the equivalent provision of the Montreal Convention is substantively the same." *Espinoza Ugaz v. Am. Airlines, Inc.*, 576 F. Supp. 2d 1354, 1360 (S.D. Fla. 2008). Both the Supreme Court and the Eleventh Circuit have concluded "the Montreal Convention 'is the exclusive mechanism of recovery for personal injuries suffered on board an aircraft.'" *Vanderwall v. United Airlines, Inc.*, 80 F. Supp. 3d 1324, 1335 (S.D. Fla. 2015) (quoting *Marotte v. Amer. Airlines, Inc.*, 296 F.3d

---

[3] Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, 3014, T.S. No. 876 (1934) ("Warsaw Convention").

[4] Montreal Protocol No. 4 to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air, signed at Warsaw on October 12, 1929, as amended by the Protocol Done at the Hague on September 8, 1955, reprinted in S. Exec. Rep. No. 105-20, pp. 21-32 (1998) ("Montreal Convention").

1255, 1259 (11th Cir. 2002)); *El Al Isr. Airlines v. Tsui Yuan Tseng*, 525 U.S. 155, 176 (1999)

(holding that "the Warsaw Convention precludes a passenger from maintaining an action for

personal injury damages under local law.").

Article 1 of the Montreal Convention provides that the Convention "applies to all

international carriage of persons, baggage, or cargo performed by aircraft for reward." Montreal

Convention art. 1. Article 17(1) explains aircraft carriers are liable for injuries suffered by

passengers:

> 1.      The carrier is liable for damage sustained in case of death or bodily injury
> of a passenger upon condition only that the accident which caused the death or
> injury took place on board the aircraft or in the course of any of the operations of
> embarking or disembarking.

*Id.* art. 17(1). Relevant here, Article 21(1) provides that "[f]or damages arising under paragraph 1

of Article 17 not exceeding 100 000 Special Drawing Rights for each passenger, the carrier shall

not be able to exclude or limit its liability." *Id.* art. 21(1). Article 23 explains "Special Drawing

Right" refers to a national currency's "Special Drawing Right as defined by the International

Monetary Fund." *Id.* art 23.[5] Article 26 in turn provides:

> Any provision tending to relieve the carrier of liability or to fix a lower limit than
> that which is laid down in this Convention shall be null and void, but the nullity of
> any such provision does not involve the nullity of the whole contract, which shall
> remain subject to the provisions of this Convention.

*Id.* art. 26.

---

[5] The United States' implementing regulation provides that this sum is fixed at $75,000.00 USD, not at the United States' Special Drawing Right. 14 C.F.R. § 203.4 (2019) ("Participation in the Montreal Agreement, whether by signing the Agreement, filing a signed counterpart to it under § 203.3, or by operation of law under § 203.5, shall constitute a special agreement between the carrier and its passengers as a condition of carriage that a liability limit of not less than $ 75,000 (U.S.) shall apply under Article 22(1) of the Warsaw Convention for passenger injury and death.").

## III. DISCUSSION

Plaintiffs contend they are entitled to summary judgment on the limited issue of the enforceability of the Limitation of Liability provision. Plaintiffs argue the Limitation of Liability provision is unenforceable under the Warsaw Convention, and Charter Defendants accordingly cannot rely on this provision as a matter of law. Atlantic argues summary judgment is warranted on Count IV because the undisputed evidence shows its negligence in fueling the Aircraft, if any, was not the proximate cause of the crash as a matter of law.

Regarding the Parties' experts, Atlantic and Charter Defendants both seek to exclude the testimony of Plaintiffs' accident reconstruction expert, Mark Pottinger. Atlantic exclusively seeks to exclude Pottinger's testimony that Atlantic failed to preserve video depicting the fueling of the Aircraft from a better angle, or that they edited the video footage. Charter Defendants seek to exclude Pottinger's testimony in its entirety. For their part, Plaintiffs seek to exclude the testimony of Charter Defendants' rebuttal experts, Captain David B. Stetson ("Captain Stetson") and Keith O. Major ("Major"), for failing to comply with Rule 26 of the Federal Rules of Civil Procedure. Alternatively, Plaintiffs argue the opinions offered by Charter Defendants' rebuttal experts are inadmissible under the *Daubert* standard because they are unhelpful.

### A.  Charter Defendants' *Daubert* Motion

As noted, Charter Defendants and Atlantic both seek to exclude or limit the testimony of Plaintiff's accident reconstruction expert, Mark Pottinger, under Federal Rules of Evidence 702, 703 and *Daubert v. Merrell Dow*, 509 U.S. 579 (1993). Charter Defendants argue Pottinger's testimony must be excluded in its entirety because he is unqualified to render an opinion on the crash and his methodology is unreliable. Plaintiffs respond that Pottinger's extensive qualifications in the field of aviation catastrophes demonstrate he is qualified. Plaintiffs also argue Pottinger

employed an industry-standard methodology that includes reviewing the relevant testimony and accident reports in this case to determine the cause of the crash.

### i.    Qualifications

As a threshold matter, Pottinger is qualified to render opinions on the cause of the plane crash. The Charter Defendants primarily argue Pottinger cannot render an opinion on the cause of the Aircraft's crash because he "only holds a single-engine private pilot's license[,]" ECF No. [81] at 3, not the multi-engine pilot license necessary to fly the Aircraft. As Plaintiffs point out, however, that argument ignores the extensive qualifications Pottinger has in the field of aviation catastrophes:

> Mr. Pottinger is an instructor in the Aviation Safety and Security Program at University of Southern California, Viterbi School of Engineering, and holds several aviation certifications from there including Aviation Safety & Security Certificate; Aviation Accident Investigation Certificate; Gas Turbine Engine Accident Investigation Certificate; Human Factors in Aviation Safety Certificate; and Safety Management Systems for Remotely Piloted Aircraft Certificate. Pottinger C.V. 1–2. [D.E. 57-1, p. 32] Mr. Pottinger is also an Aviation Accident Investigator and Reconstructionist, and some of his investigations and reconstructions have included: Fuel Starvation/Exhaustion: Beechcraft Bonanza (Monroe LA); King Air C90 (AR); Fuel Contamination: Bonanza (UT); Hydraulic Failure: Cessna 421 (Olathe, KS); Turbine Engine Failure: Cessna 208 (KS; Mexico); Multi-Engine: Piper PA-44 (West Palm Beach, FL); King Air 200 (FL); Baron (VEN); Engine Management: Commander (turbonormalized) (AZ); Spatial Disorientation/Instrument Failure: Comanche 250 (TX); Piper Meridian; Aircraft Valuation: Cessna 182RG (Broomfield, CO); Fire Foam; Airspace Violations: Pilatus (TFR penetration, Denver, CO); and Aerobatic (Broomfield, CO). Pottinger C.V. 1–2. Lastly, Mr. Pottinger also holds FAA Ratings for Airplane Single Engine Land, Instrument Airplane and LS Repairman/Maintenance – Airplane, among others. Pottinger C.V. 1–2. Mr. Pottinger is qualified to testify in this matter.

ECF No. [89] at 5. Pottinger's education, training, and experience support the conclusion that he is qualified to render an opinion on the subject crash. Charter Defendants provide no support for their position that Pottinger's lack of experience *piloting* similar aircraft, without more, demonstrates he is unqualified. Charter Defendants do not discuss Pottinger's other qualifications

at all. In their Reply, Charter Defendants point out that some of Pottinger's certifications took only a few days to obtain, and some courses he teaches are not relevant to this case. That argument simply fails to show Pottinger is unqualified, nor does it meaningfully respond to Plaintiffs' arguments.[6] The Court accordingly finds Pottinger is qualified to render an opinion on the subject crash.

### ii.    Methodology

Charter Defendants next argue Pottinger's testimony must be excluded because it relies on an unreliable methodology. Charter Defendants argue Pottinger seeks to render a "pure opinion" because the overwhelming evidence indicates the main tanks were fueled, yet Pottinger opines the auxiliary tanks were fueled. Charter Defendants further argue Pottinger's testimony is inadmissible because many of his opinions are based on an unreliable Aircraft Investigation Authority of the Bahamas Final Report (the "AAIA Report"). Plaintiffs respond that Pottinger employed a reliable, comprehensive methodology that is sufficiently supported by record evidence. Plaintiffs also argue Pottinger's reliance on the AAIA Report, among many other sources, fails to demonstrate his opinion is inadmissible.

The Court agrees with Plaintiffs. Charter Defendants essentially argue Pottinger's testimony *must* be speculative because record evidence indicates the main tanks were fueled, not the auxiliary tanks. Charter Defendants point to the fuel order requesting the main tanks be filled, Atlantic's confirmation that the main tanks were fueled, Murphy and Gutierrez's testimony that they observed the fueling of the main tanks, and surveillance video of the fueling. *See* ECF No. [81] at 5. Plaintiffs respond that Pottinger reached his opinion by applying his expertise to contrary

---

[6] Charter Defendants' observation that Pottinger referred to himself as a "consultant on these kinds of matters" similarly fails to show he is unqualified. ECF No. [81-2] at 7. As Plaintiffs point out, the label Pottinger uses to refer to his services, without more, fails to show he is unqualified.

record evidence "such as the obstructed video footage of the service line technician fueling the aircraft, a systemic fueling chart of the aircraft, and the service line technician's deposition in which he testified that the location of the auxiliary tanks was the location of the main tanks." ECF No. [86] at 14. Moreover, Pottinger's report rules out alternative explanations for the accident. As Plaintiffs point out, none of the evidence relied upon by Charter Defendants demonstrates Pottinger's opinion is speculative or otherwise unsupported. *See id.* at 15-16.

Neither does Charter Defendants' emphasis of the AAIA Report support that he utilized an unsound methodology. Charter Defendants do not discuss the methodology Pottinger actually employed. As Plaintiffs point out, Pottinger relied on methods set forth in "ICAO1 Annex 13, and the ICAO Manual on Accident Investigation, as implemented by the NTSB as taught at University of South California, Viterbi School of Engineering, Aviation Safety and Security Program[.]" ECF No. [86] at 13. Those methods guided Pottinger's theory of the crash, his ruling out of alternative causes, and his reliance on commonly accepted sources. Plaintiffs point to no less than twenty-two distinct sources upon which Pottinger's opinion is based, including the AAIA Report. *See id.* at 13-14. Charter Defendants simply assert Pottinger's opinion is based on the AAIA Report without engaging with Pottinger's expert report, methodology, or the numerous additional sources upon which he relied. Further, the fact that the AAIA Report is inadmissible under Bahamian law fails to support the conclusion that Pottinger's testimony is unreliable. The Court accordingly finds no basis to exclude Pottinger's opinions based on his methodology or his reliance on the AAIA Report.

Charter Defendants also argue Pottinger must be excluded from testifying that Gutierrez violated federal aviation regulations. For support, they cite *Langenbau v. Med-Trans Corp.*, 167 F. Supp. 3d 983 (N.D. Iowa 2016), which precluded an expert from testifying that the defendant violated aviation regulations, observing "that '[t]he law is clear that *experts* may not opine as to

whether or not a party violated a given regulation.'" *Id.* at 1004 (quoting *Cowden v. BNSF Ry. Co.*, No. 4:08CV01534 ERW, 2013 WL 5442926, *6 (E.D. Mo. Sept. 30, 2013) (alterations accepted)). Plaintiffs concede that Pottinger cannot opine as to whether Gutierrez violated federal aviation regulations. However, Plaintiffs assert that courts have found experts nonetheless "may discuss the requirements outlined in the regulations[,]" *Johnson v. Avco Corp.*, 702 F. Supp. 2d 1093, 1109-10 (E.D. Mo. 2010), as well as the evidence that *may* indicate those regulations were not followed. *See Cowden*, 2013 WL 5442926, at *6; *Alumbaugh v. Union Pac. R.R. Co.*, 322 F.3d 520, 525 (8th Cir. 2003). As such, Plaintiffs point out that while Pottinger cannot testify as to whether Gutierrez's conduct violated federal aviation regulations, Pottinger may discuss the applicable regulations in conjunction with Gutierrez's conduct.

Charter Defendants' Reply does not address Plaintiffs' argument. However, the Parties agree that Pottinger cannot offer a legal conclusion regarding whether Gutierrez violated any relevant federal aviation regulations ("FARs"). Plaintiffs are correct that FARs and other industry standards are relevant to evaluating whether Gutierrez exercised reasonable care both before and during the flight. The Court is persuaded Pottinger may properly offer testimony regarding applicable FARs and other industry standards, as well as discuss Gutierrez's conduct in the context of those standards. However, Pottinger may not offer an opinion that Gutierrez's potential violation of the FARs "would be [a] 91.13 careless operation[.]" ECF No. [81-2] at 71. The fact that Pottinger testified this *would* be his opinion—without explicitly testifying that this *is* his opinion— is a distinction without a difference. Plaintiffs are accordingly correct that Pottinger is permitted to testify as to "what the regulation is and what [Gutierrez's] conduct was[.]" ECF No. [86] at 18. Pottinger cannot testify as to "whether that conduct was in conformity with the regulations[,]"

however. *Id.* Such testimony would constitute an impermissible legal opinion regarding Gutierrez's adherence to the FARs.

The Court accordingly finds that Charter Defendants have failed to demonstrate Pottinger's testimony should be excluded because he is unqualified, or because he employs an unreliable methodology.[7] The Court precludes Pottinger's opinion regarding Gutierrez's violation of the FARs "would be [a] 91.13 careless operation" as it is an improper legal opinion. ECF No. [81-2] at 71. Charter Defendant's *Daubert* Motion is accordingly granted in part and denied in part.

### B. Atlantic's *Daubert* Motion

Atlantic argues Pottinger's anticipated testimony that Atlantic failed to preserve video evidence of the Aircraft's fueling must be excluded because it is unreliable, unhelpful, and speculative. Atlantic also contends this testimony must be excluded under Federal Rule of Evidence 403 because its probative value, if any, is substantially outweighed by the risk of unfair prejudice, misleading the jury, and confusing the issues. Plaintiffs respond that Pottinger's testimony regarding Atlantic's failure to "preserve data"—namely, additional footage of fueling the Aircraft—is reliable and relevant because it makes it more likely Atlantic also acted negligently when fueling the tanks. Atlantic replies that Pottinger's opinion lacks foundation, is irrelevant, and will invite the jury to inappropriately infer that Atlantic edited or destroyed video evidence.

### i. Methodology

Atlantic's Motion explains Noble first requested Atlantic's video footage of the fueling of the Aircraft on January 7, 2022, two days after the subject crash. *See* ECF No. [78] at 3. Atlantic provided a fueling video on January 11, 2022, which prompted Noble to request any additional

---

[7] Charter Defendants do not argue Pottinger's testimony should be excluded because it is unhelpful. The Court concludes Pottinger's anticipated testimony is clearly helpful in assisting the jury in understanding the issues. Pottinger's testimony chiefly concerns the likely cause of the subject plane crash. This testimony is therefore relevant to the claims in this case.

footage from a second camera, specifically "camera 81 for 1/5/22 06:58 to 07:48:50 which covers the entire taxi operation of N145TT." *Id.* at 4; ECF No. [78-2] at 3-4. Atlantic agreed to export the additional footage and provided the footage to Noble. ECF No. [78] at 4. Atlantic represents Noble's two requests were the only requests it received to preserve video footage, it is not standard practice to preserve all video angles of a fueling even if an aircraft crashes, and it had no reason to anticipate being named in this litigation. *See id.* at 4-5.

Atlantic therefore contends Pottinger's opinions that the videos it provided are "incomplete" because they "provide less than full coverage of both the fueling process and the loading/preflight process" or were "edited" are speculative and lack factual support. ECF No. [57-1] at 28. Accordingly, Atlantic seeks to exclude Pottinger's opinions that "Atlantic and Noble should have taken steps to preserve all video of the aircraft fueling on the morning of the crash" because "[t]he failure to preserve and provide complete videos deprives accident investigators of valuable information respecting this accident." ECF No. [57-1] at 29. Plaintiffs respond that Pottinger's opinions regarding the video footage are reliable because they are based on his experience, common-sense, and industry standards.

Plaintiffs point to Pottinger's reference to an "adequate accident/incident preparedness (AIP) plan" as an aviation industry standard that demonstrates Atlantic failed to preserve video footage. According to Plaintiffs, if Atlantic had an adequate AIP, it necessarily would have "preserved relevant date including all video footage[.]" ECF No. [87] at 7. The Court is unpersuaded. As Atlantic points out, Pottinger does not provide any basis for his opinion that Atlantic, as a fuel supplier, should have an AIP in place, and that the AIP should include automatically preserving all video footage. Plaintiffs rely on Pottinger's expert report to argue "[a]ny failure to preserve and provide complete video footage can constitute a poor AIP[.]" *See*

ECF No. [87] at 7. However, Pottinger's report does not support this assertion. Pottinger opined that an adequate AIP "includes preserving relevant data, not just selected pieces." ECF No. [57-1] at 29. Pottinger continues by noting "[a]t minimum, both Atlantic and Noble should have taken steps to preserve all video of the aircraft fueling on the morning of the crash[,]" and that "[a] more complete request would have included all video of the accident aircraft that was still in Atlantic's possession at the time of the request." *Id.* Pottinger concludes "[t]he limited video available from the two available views is evidence of poor AIP by both Noble and Atlantic[,]" a failure which "deprives accident investigators of valuable information respecting this accident." *Id.*

Pottinger's opinion fails to support Plaintiffs' position for several reasons. First, Pottinger does not distinguish between Noble and Atlantic. As Atlantic points out, Pottinger does not discuss what Atlantic's obligations were. Pottinger simply opines that both Noble and Atlantic should have done more to preserve video footage, and their failure to do so evidences a poor AIP. Second, Pottinger's opinion does not address, let alone refute, Atlantic's position that it is *not* an industry standard for fuel suppliers to preserve all video footage even in the event of a crash. Moreover, Atlantic explains it fulfilled Noble's two footage requests in their entirety, and they had no reason to expect additional requests would be made or a duty to preserve additional footage. Pottinger's suggestion that a "more complete request would have included all video of the accident aircraft that was still in Atlantic's possession" references Noble's shortcomings and not those of Atlantic. ECF No. [87] at 29. Accordingly, Pottinger's general reference to AIPs does not establish his opinion that Atlantic failed to preserve video footage is reliable.

Furthermore, the Court is unpersuaded that Pottinger's experience and training, without more, demonstrate reliability of his opinions regarding Atlantic's preservation of video footage. Plaintiffs contend Pottinger's background in accident investigations shows he should be able to

opine whether video footage is incomplete or appears edited. The Court disagrees. Pottinger may certainly testify that his opinions are limited by the lack of unobstructed video footage of the Aircraft's fueling. However, his experience with aviation accident reconstructions fails to show he is an expert in *video footage*. Neither Plaintiffs nor Pottinger articulates how this general experience shows Pottinger is in expert in evaluating whether video footage has been edited or destroyed. Moreover, Atlantic does not dispute that it did not produce footage that depicts the fueling from an unobstructed angle.

Pottinger's report notes Atlantic's "manager", Hugo Cortes, testified that Noble requested copies of the videos shortly after the crash, and that Atlantic typically preserved those security videos for 30 to 60 days. ECF No. [57-1] at 28. Pottinger also observed the "[e]mail traffic" between Atlantic and Noble indicates there was "some delay" in producing the videos, but "[e]ventually some video was provided." *Id.* Pottinger opines that "[h]ow those videos relate to the two videos produced in the litigation is not known." *Id.* Atlantic represents the two videos it produced to Noble are the only two videos it had or has in its possession.

Plaintiffs do not challenge this representation. Atlantic also points out that Pottinger's report ignores Joshua Martin's deposition testimony that Noble did not make additional requests for video footage, and that it is *not* standard practice to preserve all video footage even if an aircraft is involved in an accident. *See* ECF No. [78] (citing ECF No. [78-12] at 31, 49). As noted, Pottinger's own report observes Atlantic's standard practice is not to preserve all video footage, yet Pottinger simply asserts Atlantic should have preserved additional footage without specifying why it should have done so. Pottinger's experience fails to demonstrate his opinions regarding Atlantic's preservation of video footage are reliable on this record. Pottinger provides no support for his opinion that *Atlantic* was obligated to preserve additional video footage of the Aircraft's

fueling. The only specific evidence Pottinger points to on this issue is Cortes' testimony that Atlantic typically does *not* preserve such footage absent a duty to do so. The Court finds Pottinger's opinions on this issue are unreliable.

### ii.    Helpfulness

Even if Pottinger's experience with aviation accidents is sufficient to consider his opinions regarding the video footage reliable, Pottinger's anticipated testimony is clearly unhelpful and highly prejudicial. Atlantic argues Pottinger's anticipated testimony is unhelpful because details regarding Atlantic's "post-accident data preservation" will not assist the jury in understanding the evidence or determining a fact at issue. Atlantic points out this issue has no bearing on whether its negligence, if any, caused the plane crash, nor does it have any bearing on the cause of the crash more generally. Atlantic contends Plaintiffs are effectively seeking sanctions for spoliation of evidence, which is improper because Atlantic (1) had no duty to preserve additional video footage and (2) did not act in bad faith in failing to do so. Moreover, Atlantic argues the probative value of its failure to preserve additional footage, if any, is substantially outweighed by the risk of unfair prejudice. Plaintiffs respond that they are not seeking sanctions for spoliation of evidence. Plaintiffs do not challenge Atlantic's position that it had no duty to preserve additional video footage. Further, Plaintiffs concede there is no basis to accuse Atlantic of acting in bad faith. Plaintiffs nonetheless argue they should be able to introduce evidence of "failure to preserve relevant data." ECF No. [87] at 9. Plaintiffs argue Pottinger's opinions are relevant because "it makes the fault of Atlantic more probable[.]" ECF No. [87] at 12.

As noted, the simple fact that no unobstructed video of the Aircraft's fueling exists is clearly helpful to the jury's understanding of the evidence in this case. The jury's understanding of the expert testimony in this case will be greatly enhanced by the knowledge that those opinions lack the benefit of unobstructed video footage. However, this in no way demonstrates Pottinger's

opinion that *Atlantic* failed to preserve such footage—or edited or destroyed it—is similarly helpful to the trier of fact. Plaintiffs contend Pottinger should be permitted to testify that Atlantic failed to preserve video footage despite conceding there is no basis for spoliation sanctions. Plaintiffs rely on *Wandner v. Am. Airlines*, 79 F. Supp. 3d 1285 (S.D. Fla. 2015), *Pajak v. Under Armour, Inc.,* 636 F. Supp. 3d 629 (N.D.W. Va. 2022), and *Philips Elecs. N. Am. Corp. v. BC Tech.*, 773 F. Supp. 2d 1149 (D. Utah 2011) for support. As Atlantic accurately observes, however, those cases are distinguishable on several grounds.

Unlike here, each case featured a plaintiff who sought spoliation sanctions and a defendant who had a duty to preserve evidence. *See Wandner*, 79 F. Supp. 3d at 1302-03; *Pajak*, 636 F. Supp. 3d at 640; *Philips*, at 1213-14. For example, *Wandner* found the defendant's handling of a "video preservation letter was negligent [ ]" but found no basis for concluding this was done in bad faith. 79 F. Supp. 3d at 1303; *see Pajak*, 636 F. Supp. 3d at 640 (similar). *Philips* found spoliation sanctions *were* warranted because evidence was intentionally destroyed in bath faith, among other egregious acts. *Philips*, 773 F. Supp. 2d at 1215-16. Moreover, each found the expert in question offered reliable testimony on the issue of preservation of evidence. Here, Pottinger's testimony regarding data preservation is unreliable for the reasons discussed above. The Court is unpersuaded that testimony regarding Atlantic's purported failure to preserve video footage is admissible where, as here, (1) Plaintiffs do not seek spoliation sanctions, (2) Atlantic was under no duty to preserve any such footage, (3) Pottinger's testimony is unreliable, and (4) the record otherwise fails to support Atlantic should have preserved additional footage or their failure to do so was done in bad faith.

Furthermore, the Court finds Pottinger's testimony is inadmissible under Federal Rule of Evidence 403. Plaintiffs contend Pottinger's opinion regarding "data preservation is evidence that

supports the argument that if ATLANTIC in fact acted reasonably, it would have preserved video of the fueling process in its entirety." ECF No. [87] at 13. According to Plaintiffs, this "evidence makes it more probable that ATLANTIC fueled the wrong tanks and thus is liable for the crash." ECF No. [87] at 13. However, Atlantic correctly observes that whether it failed to preserve video footage *after* the subject crash has little relevance, if any, to whether it also acted negligently in fueling the Aircraft in the first place. Plaintiffs effectively seek to admit Pottinger's testimony to encourage the jury to infer Atlantic's failure to preserve additional footage *must* mean they were also negligent in fueling the Aircraft. The Court finds that the limited probative value of this testimony is substantially outweighed by the risk of unfair prejudice, misleading the jury, and confusing the issues. Pottinger's testimony regarding "data preservation" is excluded under *Daubert* and Rule 403.

### C. Plaintiffs' Motion to Strike Charter Defendants' Rebuttal Experts

Plaintiffs argue the Court should strike Charter Defendants' rebuttal expert reports for failing to comply with Federal Rule of Civil Procedure 26. Plaintiffs acknowledge Charter Defendants timely filed the rebuttal expert reports prepared by their two rebuttal experts, Captain Stetson and Major. However, Plaintiffs argue those rebuttal expert reports must be stricken because they simply offer expert opinions, not rebuttal opinions of the Parties' experts. According to Plaintiffs, Charter Defendants' rebuttal reports are therefore untimely expert reports and should be stricken. Alternatively, Plaintiffs argue Captain Stetson and Major's opinions should be excluded under *Daubert* because they are unhelpful. Charter Defendants respond that there is no basis to strike their timely rebuttal expert reports because Captain Stetson and Major exclusively offer rebuttal opinions and both rebuttal experts offer helpful opinions that will assist the jury in determining the cause of the subject crash.

### i.     Captain Stetson

Plaintiffs argue Captain Stetson's rebuttal report should be stricken because the report "provides additional analysis" that fails to directly respond to Pottinger and Stimson's opinion "that the wrong tanks were fueled, and that the pilot exhausted the fuel in the main tanks." ECF No. [80] at 7. This argument is meritless. As Charter Defendants point out, Captain Stetson's rebuttal report is clearly limited to rebutting the opinions offered by Plaintiffs expert, Pottinger, and Atlantic's expert, Stimson. For example, Section (i) of Captain Stetson's rebuttal report explicitly concerns "[w]here the fuel was placed by Atlantic on the morning of the Accident" and proceeds to rebut Pottinger and Stimson's opinion that the fuel was accidentally placed in the auxiliary tanks. *See* ECF No. [80-2] at 7. Captain Stetson notes he disagrees with their opinion that the auxiliary tanks were fueled, explaining the undisputed evidence shows (1) Gutierrez ordered the main tanks be fueled, (2) Atlantic's own records confirm this request, (3) video footage and Gutierrez's testimony show he physically inspected the main tanks and confirmed they had sufficient fuel, and (4) that Stimson's own testimony suggests the 66.5 gallons of fuel the Aircraft received could not fit in the auxiliary tanks. *See* ECF No. [80-2] at 7-10.

Plaintiffs argue that opinion is not a rebuttal because it discusses other evidence and fails to sufficiently explain *why* Pottinger and Stimson's opinions are mistaken. The Court disagrees with Plaintiffs and finds Captain Stetson's opinion directly rebuts Pottinger and Stimson's opinions regarding the location of the fuel and discusses the evidence that undermines those opinions. The same is true regarding Captain Stetson's rebuttal opinion on the issue of Gutierrez's pre-flight inspection. *See id.* at 10-12. Plaintiffs' assertion that they are not rebuttal opinions because Captain Stetson discusses additional record evidence and does not discuss *all* of the other evidence relied upon by Pottinger and Stimson is unpersuasive. Those arguments plainly concern the weight of Captain Stetson's opinions, not whether Charter Defendants complied with Rule 26. Plaintiffs

provide no support for striking Captain Stetson's rebuttal report where, as here, his rebuttal opinions concern the same narrow factual issues, largely rely on the same evidence, and explain why that evidence led him to a different conclusion. The Court accordingly finds no basis to strike Captain Stetson's rebuttal report for failing to comply with Rule 26.

Plaintiffs also argue Captain Stetson's opinion that the cause of the crash was "some type of mechanical issue[,]" ECF No. [80-3] at 26, must be excluded under *Daubert* because it is unhelpful and unsupported. Plaintiffs point out that Captain Stetson did not opine that the crash was probably caused by a mechanical issue in his rebuttal report, and that he offered that theory for the first time during his deposition. Charter Defendants respond by clarifying that Captain Stetson "does not contend that a mechanical irregularity caused the accident." ECF No. [89] at 6. As Charter Defendants observe, Captain Stetson offered that testimony in the context of explaining his opinion, namely, that he disagrees with Pottinger and Stimson that fuel starvation *probably* caused the crash. Captain Stetson's deposition testimony simply relays his opinion that he "can't say with any confidence that [the cause of the crash] couldn't have been something else[,]" such as "[e]ngine failure of some kind that led to – to some other catastrophe." ECF No. [80-3] at 26. Captain Stetson clarifies that this observation is simply one of "100 to 1,000 scenarios [that] could be drawn[,]" *id.*, not his theory as to the cause of the crash. *See also id.* ("It had some type of mechanical issue that … we cannot get to the bottom of in – my estimation[.]").

Plaintiffs' Motion is granted to the extent that Captain Stetson seeks to testify that the cause of the crash was *probably* engine failure. However, it does not appear that Captain Stetson offered this opinion, and Charter Defendants represent he has no intention of doing so at trial. However, Plaintiffs do not articulate a basis for excluding Captain Stetson's opinion that the record evidence "does not support fuel mismanagement at the exclusion of other potential causes [] to reasonable

degree of certainty." ECF No. [89] at 6. Consistent with his rebuttal report and deposition testimony, Captain Stetson may testify as to why he believes the record evidence fails to support the conclusion that fuel mismanagement probably caused the crash, and why the cause is inconclusive on this record.

### ii.    Keith O. Major

Plaintiffs also argue Major's opinion regarding the admissibility of the AAIA Report under Bahamian law should be excluded because it is irrelevant and unhelpful.[8] Plaintiffs contend Major's opinion that the AAIA Report is inadmissible under Bahamian law is irrelevant because (1) Bahamian law does not apply to this case, (2) the admissibility of the report is not at issue, and (3) discussing the admissibility of the AAIA Report under Bahamian law will only serve to confuse the issues.[9] Charter Defendants respond that Major's opinion is helpful because it demonstrates Pottinger's opinions are unreliable because he relied on the AAIA Report to form his conclusions. Charter Defendants therefore argue Major's opinion should be admitted to provide "clear, unequivocal, and uncontested jurisprudence of the inadmissibility of the report[.]" ECF No. [89] at 7.

The Court finds Major's opinion on the admissibility of the AAIA Report under Bahamian law is irrelevant and misleading. Charter Defendants concede experts may rely on inadmissible evidence to form their opinions "if the facts or data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *U.S. v. Frazier*, 387 F. 3d 1244, 1260 (11th Cir. 2004) (quoting Fed. R. Evid. 703)). Moreover, as discussed in the context

---

[8] As noted, Plaintiffs also assert Major's rebuttal report should be stricken because it does not actually rebut Pottinger or Stimson's opinions. Plaintiffs do not support this assertion, and the Court finds no basis to strike this report under Rule 26. As Charter Defendants point out, Major's opinion is offered for the sole purpose of rebutting Mr. Pottinger's impermissible reliance on the AAIA Report.

[9] Atlantic filed a Notice of Partial Joinder noting it supports excluding Major's opinions on the AAIA Report. *See* ECF No. [83].

of Charter Defendants' *Daubert* Motion, the Court is unpersuaded Pottinger's reliance on the AAIA Report demonstrates his opinions are unreliable. As Charter Defendants acknowledge, Major's opinion is exclusively limited to the *admissibility* of the AAIA Report. Aside from the fact that there is no indication the AAIA Report will be offered into evidence, its admissibility is a question for the Court, not the jury. Accordingly, Major's opinion that the report is inadmissible would not assist the *jury* in determining any disputed issue. It is also undisputed that Bahamian law does not apply to this case, making the admissibility of the report under Bahamian law particularly irrelevant.[10] Charter Defendants are not precluded from raising any evidentiary issues concerning the AAIA Report. However, Major's opinion regarding the admissibility of the AAIA Report under Bahamian law is irrelevant to this case and would only serve to mislead the jury and confuse the issues. Major's testimony is accordingly excluded under *Daubert*. Plaintiffs' Motion to Strike is therefore granted in part and denied in part.

### D.  Plaintiffs' Summary Judgment Motion

Plaintiffs contend the undisputed evidence demonstrates the Limitation of Liability is unenforceable under the Warsaw Convention. Plaintiffs argue the Warsaw Convention, as amended by The 1955 Hague Protocol to the Warsaw Convention ("The Hague Protocol"),[11] applies to this case. Accordingly, Plaintiffs argue the Limitation of Liability is unenforceable for failing to comply with the notice requirements contained in Article 3(a) of The Hague Protocol. Charter Defendants respond that the Limitation of Liability is enforceable under Article 3(a). Charter

---

[10] Charter Defendants also suggest the AAIA Report is inadmissible under federal law. Charter Defendants cite 49 U.S.C. § 154(b) for support, which prohibits use of accident reports prepared by the National Transportation Safety Board ("NTSB") from being "used in a civil action for damages[.]" As Plaintiffs point out, this provision fails to show the AAIA Report is inadmissible, as it exclusively concerns the admissibility of *NTSB* Reports. More importantly, the admissibility of this report is irrelevant to the jury's resolution of the factual issues in this case for the reasons discussed above.

[11] The Hague Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air, signed at Warsaw on October 12, 1929 (1955) ("The Hague Protocol").

Defendants also suggest the Montreal Convention applies to this case. Plaintiff replies that the Montreal Convention is inapplicable "because the Bahamas—the country of destination—is not a party to the Montreal Convention." ECF No. [91] at 2.

It is undisputed that the Warsaw Convention applies to this case. PSMF ¶ 6. However, the Parties fail to meaningfully analyze whether the original Warsaw Convention or its subsequent protocols—namely, The Hague Protocol and the Montreal Convention—apply to this case. The Parties' confused briefing on the subject "compels the Court to address … which version of the Warsaw Convention is currently in force in the United States." *Schopenhauer v. Compagnie Nationale Air France*, 255 F. Supp. 2d 81 (E.D.N.Y. 2003); *see also Blake v. Am. Airlines, Inc.*, 245 F.3d 1213, 1215 (11th Cir. 2001) ("Construction of the Warsaw Convention is a question of law.").

The original Warsaw Convention was signed in 1929 with a goal to "achieve uniformity of rules governing claims arising from international air transportation."[12] *Eastern Airlines v. Floyd*, 499 U.S. 530, 552 (1991). In 1999, fifty-two countries, including the United States, signed the Montreal Convention, "a treaty to replace the Warsaw Convention."[13] *Eli Lilly & Co. v. Air Exp. Int'l USA, Inc.*, 615 F.3d 1305, 1308 (11th Cir. 2010). The United States previously refused to ratify The Hague Protocol, as it "remained unsatisfied with the low liability limits, especially for personal injury claims[.]" *Schopenhauer*, 255 F. Supp. 2d at 86. However, "[m]uch of the world adopted the new version of the Convention[.]" *Id*. As the court in *Schopenhauer* observed, Article 17(2) of the Montral Convention provides "that ratification of Montreal Protocol No. 4 would have

---

[12] Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, 3014, T.S. No. 876 (1934) ("Warsaw Convention").

[13] Montreal Protocol No. 4 to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air, signed at Warsaw on October 12, 1929, as amended by the Protocol Done at the Hague on September 8, 1955, reprinted in S. Exec. Rep. No. 105-20, pp. 21-32 (1998) ("Montreal Convention").

the effect of ratification of a single treaty consisting of the terms of the original Warsaw Convention, as amended by [T]he Hague Protocol, as amended by Montreal Protocol No. 4." *Id.*; *see* Montreal Convention art. 17(2).

Accordingly, the Montreal Convention is the current version of the Warsaw Convention in force in the United States. *See, e.g.*, *Marotte*, 296 F.3d at 1259; *Tseng*, 525 U.S. at 17. The Parties do not argue otherwise. Plaintiffs nonetheless argue The Hague Protocol applies to this case because The Bahamas is not a party to the Montreal Convention. Plaintiff is correct that The Bahamas is a party to the Warsaw Convention as amended by The Hague Protocol, but not the Montreal Convention. As discussed above, the United States is a party to all three treaties by virtue of its accession to the Montreal Convention. This fails to show The Hague Protocol applies to this case, however.

As Plaintiff correctly points out, the Warsaw Convention, as amended by The Hague Protocol, applies to "any carriage in which, according to the agreement between the parties… are situated either within the territories of two High Contracting Parties or within the territory of a single High Contracting Party if there is an agreed stopping place within the territory of another State." The Hague Protocol art. 1(2). The Montreal Convention includes the same language. *See* Montreal Convention art. 1(2). Accordingly, all versions of the Warsaw Convention encompass international carriage (1) between "the territories of two High Contracting Parties" or (2) "within the territory of a single High Contracting Party if there is an agreed stopping place within the territory of another State." *Id.*

The Parties do not analyze this language. Plaintiffs contend "the Warsaw Convention as modified by the Hauge Protocol [applies] because Defendant is in the United States … and the United States is a contracting party to the Convention and the Protocol." ECF No. [71] (footnote

omitted). Plaintiffs further note "[a]dditionally, here, there was an agreed stopping place within the territory of Chub Cay, Bahamas." *Id.* Charter Defendants do not explicitly argue which version of the Warsaw Convention applies. However, Charter Defendants provide a Notice of Supplemental Authority, ECF No. [92], suggesting the Montreal Convention applies on this record.

The Court accordingly must determine which version of the treaty applies to this case. Plaintiffs observe Murphy's international flight began in the United States, with an agreed stopping place in The Bahamas. As discussed, however, the Montreal Convention is the treaty currently in force in the United States. Moreover, it *also* applies "within the territory of a single High Contracting Party if there is an agreed stopping place within the territory of another State." Montreal Convention art. 1(2). Plaintiffs fail to explain why the Montreal Convention is inapplicable where, as here, Plaintiffs contend the subject flight took place within the territory of a single contracting party (the United States) with an agreed stopping place within the territory of a non-party (The Bahamas).

For their part, Charter Defendants provide case law uniformly interpreting this language to mean the Montreal Convention applies to round-trip flights from the United States even if the "agreed stopping place" is within the territory of a non-party. *Smith v. Am. Airlines, Inc.*, C 09-02903 WHA, 2009 WL 3072449, at *5 (N.D. Cal. Sept. 22, 2009); *Knowlton v. Am. Airlines, Inc.*, CIV.A. RDB-06-854, 2007 WL 273794, at n. 1 (D. Md. Jan. 31, 2007); *In re Air Crash at Lexington*, KY, August 27, 2006, 501 F. Supp. 2d 902, 908 (E.D. Ky. 2007).

*Smith* explicitly found the requirements of "Article 1(2) of the Montreal Convention are satisfied, as the incident in question occurred on 'international carriage' during international travel on plaintiffs round-trip ticket flight from Florida to the Bahamas." 2009 WL 3072449, at *5. In *Knowlton*, the court observed both the Warsaw and Montreal Conventions "apply to flights

between countries that are members of the treaty as well as round-trip flights from a member country where at least one stop is in a different country." 2007 WL 273794, at *1. The plaintiff's destination was the Dominican Republic which, like The Bahamas, "is a party to the Warsaw Convention but not the Montreal Convention." *Id.* n.1. "Thus, a one-way trip from the United States to the Dominican Republic would only be governed by the Warsaw Convention while a round-trip ticket would be governed by the superseding Montreal Convention." *Id.* The court concluded the Montreal Convention applied because "it is clear that Plaintiff's ticket was a round-trip[.]" *Id.; see also In re Air Crash at Lexington*, 501 F. Supp. 2d at 908 *(*"... a one-way trip from the United States to the Dominican Republic would only be governed by the Warsaw Convention while a round-trip ticket would be governed by the superseding Montreal Convention.").

The Court is persuaded that those decisions correctly interpret the plain language of Article 1(2) of the Warsaw Convention *and* the Montreal Convention.[14] Plaintiffs do not attempt to distinguish those cases yet advocate for that interpretation, albeit while arguing The Hague Protocol applies. The Court accordingly finds Article 1(2) of the Montreal Convention applies to round-trip flights from the United States even if the trip includes a stop in the territory of a non-party. Moreover, the record demonstrates the subject incident took place during a round-trip flight. Gutierrez and Murphy both testified the flight was part of a round-trip ticket, which is confirmed by a series of emails between Murphy and Charter Defendants. *See* ECF No. [84-6] at 25; ECF No. [71-3] at 54-55; ECF No. [88-2] at 2.[15]

---

[14] This interpretation is consistent with the Eleventh Circuit's application of the Montreal Convention in similar circumstances. *See Marotte v. American Airlines, Inc.*, 296 F.3d 1255, 1257 (11th Cir. 2002) (applying the Montreal Convention where "the flight in question was [intended] to be the final leg of [the plaintiffs'] round-trip travel from New York to the Bahamas.").

[15] The copy of the itinerary provided to the Court only includes a single flight on January 5, 2022 *from* the Bahamas to the United States. *See* ECF No. [37-3]. The remaining itinerary details flights from the week prior. *See id.* As discussed, however, the Parties' testimony and emails confirm the flight was part

Accordingly, the Montreal Convention applies to this case. The Parties' arguments regarding the applicability of Article 3(a) of The Hague Protocol are consequently misplaced. Article 3(a) of The Hague Protocol requires passenger tickets to contain "a notice to the effect that, if the passenger's journey involves an ultimate destination or stop in a country other than the country of departure, the Warsaw Convention may be applicable … and in most cases limits the liability of carriers for death or personal injury." Article 3(b) in turn provides that "if, with the consent of the carrier, the passenger embarks without a passenger ticket having been delivered, or if the ticket does not include the notice required by paragraph 1(c) of this Article, the carrier shall not be entitled to avail himself of the provisions of Article 22." *Id.* art. 3(b).

Unlike The Hague Protocol, the Montreal Convention explicitly prohibits limiting liability for damages of $75,000 or less. *See* Montreal Convention 21(1).[16] As this Court observed in its Order on Motion to Dismiss, ECF No. [47], the Montreal Convention also prohibits agreements seeking to absolve a carrier from liability:

> Airway and Gutierrez [the Charter Defendants] are correct that the [Montreal] Convention generally allows parties to enter into agreements providing for *different* limitations of liability. However, such agreements may only provide for a limitation of liability *above* the Convention's cap of $75,000.00 USD. *See* Montreal Convention art. 21(1). Agreements fixing liability below $75,000.00 are explicitly unenforceable under the [Montreal] Convention. *Id.* art. 26 ("Any provision *tending to relieve the carrier of liability* or to fix a lower limit than that which is laid down in this Convention shall be null and void[.]") (emphasis added).

---

of a round-trip ticket. Murphy's testimony indicates this itinerary only features his *return* flight from The Bahamas on January 5, 2022—not the departure flight that is the subject of this case. *See* [71-3] at 55-57.

[16] The Montreal Convention articulates this figure in terms of "Special Drawing Rights", or a method for converting a state party's currency to calculate the applicable sum. The United States' implementing regulation provides that this sum is fixed at $75,000.00 USD, not at the United States' Special Drawing Right. 14 C.F.R. § 203.4 (2019) ("Participation in the Montreal Agreement, whether by signing the Agreement, filing a signed counterpart to it under § 203.3, or by operation of law under § 203.5, shall constitute a special agreement between the carrier and its passengers as a condition of carriage that a liability limit of not less than $ 75,000 (U.S.) shall apply under Article 22(1) of the Warsaw Convention for passenger injury and death."). Charter Defendants argue this demonstrates the Limitation of Liability is enforceable. This argument is meritless. Charter Defendants do not argue Plaintiffs seek $75,000 or less in damages, and the Court finds no basis for that conclusion.

*Id.* at 10 (footnote call number omitted).

The Limitation of Liability is accordingly null and void under the Montreal Convention, as it constitutes a provision "tending to relieve the carrier of liability." Montreal Convention art. 26. The Montreal Convention only provides two other scenarios where a carrier "shall not be liable" for personal injuries during a flight: "if the carrier proves that … (a) such damage was not due to the negligence or other wrongful act or omission of the carrier of its servants or agents; or (b) such damage was solely due to the negligence or other wrongful act or omission of a third party." *Id.* at art. 21(2). Accordingly, Charter Defendants cannot limit their liability unless and until they demonstrate Murphy's injuries were not the result of their negligence, wrongful acts or omissions, or that those injuries were solely caused by the negligence or wrongful act of a third party.

The Court finds Plaintiffs are entitled to summary judgment regarding the Limitation of Liability. The undisputed evidence demonstrates the Montreal Convention applies and the Limitation of Liability is unenforceable under the plain language of the Montreal Convention. Plaintiffs have accordingly shown the Charter Defendants cannot rely on the Limitation of Liability provision as a matter of law.

### E.  Atlantic's Summary Judgment Motion

Atlantic contends it is entitled to summary judgment because the undisputed evidence shows it did not proximately cause Murphy's injuries.[17] Atlantic argues that even if it failed to fill the main fuel tanks as instructed, the record demonstrates Atlantic's negligence was not the but-for cause of Murphy's injuries, nor was it foreseeable that fueling the wrong tanks would cause

---

[17] Atlantic requested that the Court conduct a hearing to adjudicate the issues raised in its Summary Judgment Motion. The Court finds conducting a hearing is unnecessary in light of the narrow legal issues raised in the Parties' Summary Judgment Motions.

those injuries. According to Atlantic, any negligence on its part was clearly superseded by Gutierrez's negligent operation of the Aircraft. Plaintiffs respond that whether Atlantic *and* Gutierrez's negligence caused Murphy's injuries constitute a genuine dispute of material fact. Plaintiffs contend there is a genuine dispute of material fact regarding whether Atlantic's failure to fill the main fuel tanks was the but-for cause of the accident, as well as whether that failure foreseeably led to Murphy's injuries.

To prevail on a negligence claim under Florida law, a plaintiff must demonstrate a defendant (1) owed them a duty of reasonable care; (2) breached that duty; and that the breach (3) proximately caused (4) actual loss or damages. *Clay Electric Coop., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003); *Palma v. BP Prods. N. Am., Inc.*, 347 Fed. App'x 526, 527-28 (11th Cir. 2009). "To establish proximate cause in Florida, the court must find both a cause in fact (that the injury would not have occurred "but for" the negligent act) and that the injury was a reasonably foreseeable result of the act." *Zinn v. United States*, 835 F. Supp. 2d 1280, 1311 (S.D. Fla. 2011) (citing *Clay Electric*, 873 So. 2d at 1185; *United States v. Stevens*, 994 So. 2d 1062, 1066 (Fla. 2008)); *see also Deese v. McKinnonville Hunting Club, Inc.*, 874 So. 2d 1282, 1287 (Fla. 1st DCA 2004) ("Proximate causation consists of both cause in fact and foreseeability.").

"Although the issue of foreseeability is ordinarily a question of fact for a jury to resolve, it may be decided by a court 'when facts are unequivocal, such as where the evidence supports no more than a single reasonable inference.'" *Palma*, 347 Fed. App'x at 528 (quoting *McCain v. Fla. Power Corp.,* 593 So.2d 500, 503 (Fla. 1992)). This determination turns on "whether the harm that occurred was within the scope of the danger attributable to the defendant's negligent conduct." *Worthington v. United States*, 21 F.3d 399, 405 (11th Cir. 1994). As the Florida Supreme Court has explained, "a negligent party is not liable for another's injuries when a separate force or action is

the active and efficient intervening cause, the sole proximate cause or an independent cause." *Department of Transportation v. Anglin*, 502 So.2d 896, 898 (Fla. 1987). In such circumstances, a tortfeasor typically will not be liable for negligent acts "which, although caused-in-fact by the defendant's negligent act or omission, seem to the judicial mind highly unusual, extraordinary, bizarre … [or otherwise] beyond the scope of any fair assessment of the danger created by the defendant's negligence." *Id.* (quotation omitted).

Atlantic contends it is entitled to summary judgment because the undisputed evidence shows its negligent conduct, if any, was neither the cause in fact nor a foreseeable result of that negligence. Atlantic argues that Gutierrez's negligent operation of the Aircraft clearly supersedes any negligence on the part of Atlantic. In short, Atlantic asserts summary judgment is warranted because the Parties' dispute about which tanks were filled is immaterial. Plaintiffs do not dispute that Gutierrez's negligent operation of the Aircraft is *one* of the causes of Murphy's injuries. However, Plaintiffs contend Murphy's injuries were caused by a combination of Atlantic's negligent fueling of the Aircraft and Gutierrez's negligent operation of the Aircraft. Plaintiffs accordingly argue the record demonstrates that whether Atlantic was also negligent is a genuine dispute of material fact.

### i.   Cause-in-Fact

A genuine dispute of material fact exists as to whether Atlantic's failure to fill the main fuel tanks was the cause-in-fact of Plaintiff's injuries. The Parties dispute whether Atlantic filled the Aircraft's main fuel tanks or its auxiliary fuel tanks. Plaintiffs argue Atlantic was negligent by failing to fill the correct fuel tanks, and Gutierrez was negligent by failing to recognize the fuel was in the auxiliary tanks during his pre-flight check and the flight, thereby starving the Aircraft of fuel by relying on the main tanks for the entire flight. Atlantic contends the main tanks were filled. However, Atlantic argues that which tanks were fueled is *not* a genuine dispute of material

fact. According to Atlantic, it was not the cause-in-fact in either scenario. Regardless of whether "Atlantic fueled inconsistent with the pilot's fuel order as Plaintiffs contend, or Atlantic fueled the main tanks consistent with the pilot's fuel order as [Noble] contends[,]" ECF No. [68] at 9, the evidence shows Gutierrez's negligence was the cause-in-fact of Murphy's injuries.

Whether the main tanks or auxiliary tanks were filled is both a genuine and material dispute. Atlantic does not attempt to show the undisputed evidence demonstrates the main tanks were fueled as expected. Atlantic nonetheless argues that even if it filled the wrong tanks, doing so cannot be the cause-in-fact of Murphy's injuries as a matter of law. The Court is unpersuaded. As Plaintiffs point out, the crux of their theory of negligence is that Murphy's injuries were caused by a combination of Atlantic filling the auxiliary tanks, despite being told to fill the main tanks, and Gutierrez's failure to recognize the fuel was in the auxiliary tanks and consequently starving the Aircraft of fuel. Plaintiffs argue Atlantic's negligence was the cause in fact of Murphy's injuries: "but for ATLANTIC's fueling of the wrong tanks, the aircraft would not have run out of fuel in the main tanks, the engines would not have stalled, the aircraft would not have crashed, and Plaintiff would not have suffered injuries." ECF No. [84] at 7.

Plaintiffs accordingly contend Atlantic's negligence was the but-for cause of Murphy's injuries because Gutierrez's failure to locate which tanks housed the Aircraft's fuel could not have independently caused Murphy's injuries. If the fuel was in the main tanks as expected, the crash would not have occurred even if Gutierrez failed to conduct appropriate pre-flight inspections and monitor the fuel gauge. In this scenario, the flight would have been successful due to sheer luck, and despite Gutierrez's negligent pre-flight inspection and operation of the Aircraft. The fact that Gutierrez is responsible for ensuring the Aircraft has sufficient fuel and locating where that fuel is

housed, among other obligations, fails to show Atlantic's negligence *cannot* be the cause-in-fact of Murphy's injuries on this record. Atlantic provides no support for this position.

Instead, Atlantic replies that Plaintiffs fail to show the subject plane crash constitutes a "natural, direct and continuous sequence" of fueling the auxiliary fuel tanks. *Abrisch v. United States*, 359 F. Supp. 2d 1214, 1229-30 (M.D. Fla. 2004). For support, Atlantic points out that Plaintiffs provide no authority or expert testimony supporting the notion "that fuel located in the auxiliary tank is unusable or inaccessible to the pilot." ECF No. [96] at 5. As discussed, however, Plaintiffs do not argue the fuel was inaccessible. They argue it was and that Gutierrez was also negligent in failing to recognize the auxiliary tanks were fueled. Finding a failure to fuel the "correct" tanks *could* be a cause in fact is a common sense conclusion in this context. All of Gutierrez's alleged actions and omissions center around his failure to locate which tanks housed the Aircraft's fuel and operated the Aircraft accordingly.

Tellingly, Atlantic observes the accident would not have occurred but for "*some* intervening negligence on the part of the pilot." ECF No. [96] at 4 (emphasis added). However, as Plaintiffs persuasively argue, Atlantic's failure to fuel the proper tanks may nonetheless be a cause-in-fact of Murphy's injuries even if Gutierrez negligently operated the Aircraft. On this record, Atlantic's negligence could well be the cause-in-fact of Murphy's injuries provided Plaintiffs show (1) Atlantic fueled the auxiliary tanks despite informing Gutierrez and Venture that they filled the main tanks, and (2) the Aircraft was starved of fuel and crashed because Gutierrez failed to recognize the main tanks did not contain the Aircraft's fuel as expected. The fact that both Atlantic and Gutierrez both must be negligent for this to occur fails to disturb the conclusion that, but-for Atlantic fueling the wrong tanks, Gutierrez's negligence would not have led to fuel starvation and

the ensuing crash. Defendants have accordingly failed to show the absence of a genuine dispute of material fact regarding which sets of tanks were filled and which tanks Atlantic was told to fill.

### ii.    Foreseeability

Atlantic argues that even if its failure to fuel the main tanks was a but-for cause of Murphy's injuries, the undisputed evidence demonstrates Gutierrez's negligent operation of the Aircraft constitutes an independent, superseding proximate cause. Atlantic therefore contends summary judgment is warranted because it was unforeseeable that its negligent conduct, if any, would cause Murphy's injuries. Plaintiffs respond that whether Atlantic's conduct foreseeably led to his injuries constitutes a genuine dispute of material fact. Plaintiffs contend Atlantic had reason to anticipate Gutierrez may negligently assume the fuel was in the main tanks, and the record supports the reasonable inference that *both* Atlantic and Gutierrez's negligence led to Murphy's injuries.

The Court views the facts in the light most favorable to Plaintiffs and draws all reasonable inferences in Plaintiffs' favor. *See Davis*, 451 F.3d at 763. As noted, the Parties dispute which tanks were fueled and which tanks were *supposed* to be fueled. Plaintiffs contend Atlantic's failure to fuel the main tanks foreseeably caused Murphy's injuries because "(1) The pilot had requested the main tanks to be fueled, (2) this was a simple round-trip flight the pilot had done before, and (3) according to the 'Pilot Operating Handbook' the pilot was supposed to fly on the main tanks for the entire flight." ECF No. [84] at 9 (citing ECF No. [80-1] at 5; ECF No. [84-7]; ECF No. [84-6] at 8-9, 24-25; ECF No. [84-8] at 2). Moreover, Plaintiffs point out Atlantic confirmed the Charter Defendants' request that the main tanks be fueled for the flight, and that Atlantic's fuel technician, Rizzo, incorrectly testified the main tanks are located "on the wing … not the tip tanks." ECF No. [84-3] at 41. Plaintiffs argue this evidence supports the reasonable inference that Atlantic's negligence was foreseeable because it confirmed the main tanks would be fueled when they were not, which contributed to Gutierrez conducting a negligent pre-flight check and negligently

monitoring the fuel gauge. Coupled with the routine nature of the flight and the Pilot Operating Handbook's instruction to fly on the main tanks provided there is sufficient fuel, Plaintiffs contend Atlantic could have anticipated its negligence may have led Gutierrez to assume the main tanks contained enough fuel.[18]

Atlantic does not argue Plaintiffs fail to support their position with sufficient evidence. Nor could it—as detailed above, Plaintiffs rely on email confirmations, the Pilot Operating Handbook, Gutierrez and the fuel technician's deposition testimony, and Pottinger and Stimson's expert reports. Atlantic instead argues that evidence is immaterial because the undisputed evidence shows Gutierrez's negligence was a superseding cause of Murphy's injuries. Atlantic contends they had no reason to anticipate the numerous ways in which Gutierrez actions or omissions led to fuel starvation and the crash. Even if Plaintiffs' version of events is true, Atlantic had no reason to anticipate their conduct would lead Gutierrez to conduct a negligent pre-flight check, fail to confirm there was sufficient fuel, to observe and monitor the fuel gauge, to operate the fuel selector valve, or to continue to fly on the main tanks despite lacking sufficient fuel.

Plaintiffs do not dispute that Gutierrez negligently operated the Aircraft in multiple ways. As discussed, their theory of liability depends on it. However, they argue their supporting evidence, while not excusing Gutierrez's negligence, supports the reasonable inference that Atlantic's negligent fueling of the auxiliary tanks foreseeably led to the crash.

Under Florida law, the Court may take the question of foreseeability "from the factfinder only where the facts are unequivocal, such as where the evidence supports no more than a single reasonable inference." *McCain*, 593 So.3d at 504. For the reasons discussed below, the Court finds

---

[18] The Court appreciates that the Pilot Operating Handbook in no way relieves Gutierrez from his obligation to ensure the Aircraft contains sufficient fuel for the flight, and to ensure he knows where the fuel is. However, it reinforces the reasonableness of the inference that Atlantic's negligent fueling of the auxiliary tanks may have contributed to Gutierrez negligent monitoring of the fuel gauges.

this record supports the reasonable inference that Atlantic's conduct is within "the scope of any fair assessment of the danger created by the defendant's negligence." *Anglin*, 502 So.2d at 898. Whether this is in fact the case is a question for the jury.

Atlantic contends "[e]ven if [it] committed some error in fueling the auxiliary tanks or in failing to require the pilot stay planeside during the fueling (the only two potential 'breaches' identified by Plaintiffs' expert), such actions were wholly replaced by and superseded by the unforeseeable negligent actions of the pilot both before and during the flight." ECF No. [68] at 10. For support, Atlantic observes Plaintiffs do not dispute Gutierrez must have negligently operated the Aircraft for the crash to occur. Atlantic also relies on Federal Aviation Regulations ("FARs"), which it accurately observes "have the force and effect of law." *Airplanes of Boca, Inc. v. United States*, 254 F. Supp. 2d 1304, 1312 (S.D. Fla. 2003) *aff'd*, 112 Fed. App'x 4 (11th Cir. 2004). Atlantic points out the FARs provide Gutierrez, as the pilot of the Aircraft, "is directly responsible for, and is the final authority as to, the operation of that aircraft." 14 C.F.R. § 91.3(a). The FARs also obligate Gutierrez to familiarize himself with all available information before a flight, 14 C.F.R. § 91.103, including by determining flight's "fuel requirements," § 91.103(a), and ensuring there is sufficient fuel onboard, § 91.151. Because it is undisputed the Aircraft contained sufficient fuel, Atlantic argues Gutierrez' failure to adhere to those duties was unforeseeable, and Atlantic accordingly cannot be liable for Murphy's injuries.

Plaintiffs do not dispute that Gutierrez had those duties, and they agree he breached those duties. On this record, Atlantic had reason to anticipate fueling the auxiliary tanks after confirming it fueled the main tanks could contribute to Gutierrez's negligent operation of the Aircraft. Atlantic fails to cite a single case that granted summary judgment on the issue of foreseeability, let alone one that did so while applying Florida law. Instead, Atlantic primarily relies on two cases from this

Case No. 23-cv-23654-BLOOM/Torres

District, *Airplanes of Boca, Inc. v. United States*, 254 F. Supp. 2d 1304, 1312 (S.D. Fla. 2003) *aff'd*, 112 Fed. App'x 4 (11th Cir. June 17, 2004) and *In re Air Crash Near Rio Grande, Puerto Rico, on Dec. 3, 2008*, No. 11-CV-80761, 2016 WL 6916600 (S.D. Fla. Oct. 24, 2016). Both cases held bench trials and ultimately concluded the air traffic controllers at issue did not act negligently in providing air traffic signals to pilots, and even if they were, the pilot was solely responsible for the crash.

In *Boca*, the personal representatives of the estates of the pilot and airline passengers sued the Federal Aviation Administration ("FAA") for causing a fatal plane crash. The court determined the cause of the plane crash "was most likely spatial disorientation suffered by [the pilot] after entering IMC [impaired visual] conditions." *Id.* at 1310. In other words, the pilot lost his bearings while flying in poor weather conditions and crashed the plane. The court observed "[t]he pilot has 'final authority, even over air traffic controllers[,]'" and that "[e]ven if a controller issues a wrong heading or instruction, the pilot has the 'primary duty to avoid a hazard that he himself could or should have perceived.'" *Id.* at 1312 (quoting *In re Air Crash Disaster at JFK,* 635 F.2d 67, 74 (2d Cir.1980); *Jackson v. United States,* 983 F. Supp. 273, at 279, n. 9 (D. Mass. 1997), *aff'd*, 156 F.3d 230 (1st Cir. 1998)). Moreover, the court found 14 C.F.R. § 91.103's requirement that "the pilot in command, shall, before beginning a flight, become familiar with all available information concerning that flight … certainly would include close scrutiny of the precipitation depicted on the pilot's own on-board weather display." *Id.*, at 1312. Conversely, air traffic controls generally do not owe "mandatory duties with regard to weather information[.]" *Id.* at 1314.

The court accordingly compared the relative duties at issue: "The pilot-in-command has the primary and ultimate responsibility for the flight and must look out for and avoid dangerous weather conditions; the provision of 'weather assistance' by [air traffic controllers] is an additional

service which is not mandatory." *Id.* (citing *Mallen v. United States,* 506 F. Supp. 728, 734 (N.D. Ga. 1979)). The court found in favor of the FAA, concluding "[w]hen a pilot knows or should know what weather he will encounter in flight, nothing the weather briefer does or fails to do can be the proximate cause of a later crash." *Id.* at 1314.

In *Rio Grande,* the plaintiffs also sued the FAA on behalf of three individuals who were killed during a plane crash on a flight to Puerto Rico. 2016 WL 6916600, at *1. As in *Boca*, the plaintiffs argued "that air-traffic controller negligence was the sole and proximate cause of the accident." *Id.*, at *3. The court similarly observed "[a] pilot has a duty to be aware of danger when he can perceive it with his own eyes, ears, and instruments." *Id.* (citing *Boca*, 254 F. Supp. at 1313; *Pan Am. World Airways, Inc. v. Port Auth. of New York*, 787 F. Supp. 312, 318 (E.D.N.Y. 1992), *rev'd on other grounds against nongovernment defendant*, 995 F.2d 5 (2d Cir. 1993)). Further, the pilot was flying under visual flight rules ("VFRs"), which impose duties to maintain adequate visibility and avoid clouds or inclement weather. *See id.* ("The pilot under VFR flight rules is prohibited by the FARs to fly through clouds or in areas of reduced visibility, and, as stated previously, VFR pilots are not to fly into clouds if they can be avoided.") (citing 14 C.F.R. § 91.155; *Srock ex rel. Est. of Srock v. United States*, 462 F. Supp. 2d 812, 825 (E.D. Mich. 2006); *Cappello v. Duncan Aircraft Sales of Fla., Inc.*, 79 F.3d 1465, 1469 (6th Cir. 1996)). Accordingly, "[p]ilots flying under VFR are required to maintain flight in visual flight conditions, and controllers are entitled to assume that a VFR pilot is doing so unless informed otherwise." *Id.*, at *5 (citations omitted). The court also observed air traffic controllers have no duty to warn pilots (1) not to enter weather "below the VFR minima"; (2) any dangers "the pilot is or should be aware of through the exercise of due care"; or (3)"of the presence of terrain or obstacles when the pilot is expected to remain in visual conditions[.]" *Id.*, at *6 (citations omitted).

*Rio Grande* then applied those principles and found "there was nothing improper, negligent, or below the standard of care" about the air traffic controllers signals. *Id.* The court instead found the pilot failed to maintain proper VFR conditions, observing "[o]f critical importance to this entire episode us the fact that [the pilot] was flying VFR, and [the air traffic controller] specifically told [the pilot] to maintain VFR." *Id.*, at *7. The court rejected the plaintiffs' arguments that the air traffic controller had any duty to warn the pilot of any hazardous condition because (1) the air traffic controller generally has no such duty under aviation regulations and (2) the record demonstrated the pilot, "flying VFR, was in the best position to observe the weather conditions he was approaching and act accordingly." *Id.*, at *9.

The court concluded the pilot's negligence was the sole and proximate cause of the plane crash even if the air traffic controller was negligent, explaining "just as it would be [the pilot's] sole responsibility if he flew directly into the mountain seeing it right in front of him, it is [pilot's] sole responsibility for flying directly into the clouds that obscured his view of the mountain when the rules for flying VFR, the purpose of which are designed precisely to prevent such occurrences, prohibited him from doing so." *Id.*, at *9. The court suggested this would be the case because "[t]he fact that [the air traffic controller] led him on the path to the clouds and the mountain was not a proximate or contributing cause of [the pilot] violating the rules for flying VFR which led to him not seeing the mountain and flying into it." *Id.*, at *9.

Atlantic contends *Boca* and *Rio Grande* support finding Gutierrez's negligent operation of the Aircraft was the sole and proximate cause of the crash as a matter of law. However, both cases conducted bench trials and concluded the record evidence after trial demonstrated the pilot was the sole and proximate cause of the crash. *See Boca*, 254 F. Supp. 2d 1309-10, 1315; *Rio Grande*, 2016 WL 6916600, at *9. Further, *Boca's* brief discussion of Florida negligence law supports

*denying* Atlantic's Motion. *See Boca*, 254 F. Supp. 2d at 1314 ("The standard of care owed the plaintiff will be determined in the context of the relationship between the plaintiff and the defendant at the time of the accident … [w]hether the defendant has breached his/her legal duty is a question for the trier of fact."). Moreover, the relative duties and theories of liability are distinct from this case. As discussed, the plaintiffs in both cases argued the *air traffic controllers* were the sole and proximate cause of the plane crash because they failed to warn the pilot of bad weather, an approaching obstacle, or both. The plaintiffs argued that both the air traffic controller and pilot had concurrent duties to safely operate the aircraft, and the air traffic controller's failure to exercise its duty of reasonable care caused the crash. Here, Plaintiffs argue Atlantic and Gutierrez *consecutively* breached *mandatory* duties of reasonable care—Atlantic fueled the wrong tanks, and Gutierrez failed to realize that the wrong tanks were fueled and operate the Aircraft accordingly.

Atlantic argues "like the air traffic controllers in the *Boca* and *In re Air Crash near Rio Grande* cases, the pre-flight actions of the fueler are not the proximate cause of this accident." ECF No. [68] at 14. This ignores the relative duties, reasoning, and factual circumstances of each case. Neither case concerns the *pre-flight* actions of air traffic controllers. Each court found the air traffic controller did not cause the subject plane crash because the facts and applicable aviation regulations established the air traffic controller had no duty to warn, and that the pilot was solely responsible for the crash. The applicable aviation regulations also made clear the air traffic controllers were entitled to assume the pilot would adhere to strict VFR regulations while operating the flight. Neither court in *Boca* nor *Rio Grande* rested its conclusion on the mere fact that the pilot bears ultimate responsibility for operating the aircraft and must adhere to aviation regulations.

Here, Atlantic does not dispute it owed a mandatory duty to exercise reasonable care in fueling the aircraft. Moreover, the fact that Gutierrez was required to ensure the Aircraft had

sufficient fuel fails to show he *must* have been the sole proximate cause of the accident. It is undisputed that the Aircraft contained enough fuel. ASMF ¶ 7; PSAMF ¶ 7. However, the extent to which Atlantic's negligence, if any, contributed to Gutierrez's failure to notice the auxiliary tanks were fueled is unclear. The cause of the Aircraft's crash is also unclear. Atlantic contends whether it fueled the wrong tanks is irrelevant, as is whether it erroneously told Gutierrez the main tanks were fueled, among other shortcomings. But those facts are critical, as are the particular facts regarding how and why the Aircraft crashed. The relative duties of the Parties are consequently unclear on this record, as are whether breaches of those duties caused Murphy's injuries.

Consistent with *Boca* and *Rio Grande*, the Court accordingly finds the issue of foreseeability should be properly reserved for the trier of fact.[19] The Court's conclusion is consistent with Florida cases that reversed grants of summary judgment on the issue of foreseeability.[20] *See Serrano v. Dickinson*, 363 So. 3d 162, 169 (4th D.C.A. 2023) (finding truck driver's negligent operation of his vehicle did not supersede accident that occurred an hour earlier because "such inattention is a foreseeable cause of a collision with a stopped vehicle on an expressway, the law permits the conclusion that Dickinson's conduct set in motion a chain of

---

[19] The remaining decisions relied upon by Atlantic are unpersuasive for the same reasons. Those cases concern the relative duties of air traffic controllers and pilots during a flight. *See* ECF No. [68] at 15-16. None granted summary judgment on the issue of foreseeability, and each is legally and factually distinguishable. *See* ECF No. [68] at 15-16.

[20] The only case the Parties discuss that *granted* summary judgment on the issue of foreseeability is *Dep't of Transp. v. Anglin*, 502 So. 2d 896, 898 (Fla. 1987). As Plaintiffs point out, however, *Anglin* featured a driver who was driving on the highway in the opposite direction of the plaintiffs, who were involved in a car accident fifteen minutes earlier. *See id.* at 897. The driver abruptly "slammed on his brakes, spun around before reaching the puddle of water, and headed back toward the [plaintiffs'] vehicle. With the engine roaring and at a speed approaching forty miles per hour, [the driver] failed to stop and slammed into the back of the ... [plaintiffs'] truck." *Id.* at 897. The Florida Supreme Court concluded this "bizarre and reckless conduct" did not "set in motion a chain of events resulting in injuries ... it simply provided the occasion for [the driver's] gross negligence." *Id.* (citation omitted). The record does not support that the subject plane crash was a similarly "extraordinary, freakish, or bizarre[ ]" accident such that judgment as a matter of law is proper. *Serrano*, 363 So.3d at 168.

events resulting in injury to the plaintiff."); *Cooke v. Nationwide Mut. Fire Ins. Co.*, 14 So. 3d 1192, 1195 (1st DCA 2009) (similar); *Deese v. McKinnonville Hunting Club, Inc.*, 874 So. 2d 1282, 1287-88 (1st DCA 2004). Atlantic observes that none of those cases are in the aviation context. As discussed, however, Atlantic fails to show cases that applied those tort principles in the aviation context support a contrary result. The Court accordingly finds that whether Atlantic proximately caused the crash by negligently fueling the auxiliary tanks constitutes a genuine dispute of material fact.

## IV.      CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Atlantic's Motion for Summary Judgment, **ECF No. [68]**, is **DENIED**.

2. Plaintiffs Motion for Partial Summary Judgment, **ECF No. [71]**, is **GRANTED**.

3. Atlantic's Motion to Exclude Opinions and Testimony from Plaintiffs' Expert Mark A. Pottinger, **ECF No. [78]**, is **GRANTED**.

4. Plaintiffs' Motion to Strike Charter Defendants' Rebuttal Experts, **ECF No. [80]**, is **GRANTED IN PART and DENIED IN PART**.

5. Charter Defendants' Motion to Exclude or Limit Expert Testimony of Mark A. Pottinger, **ECF No. [81]**, is **GRANTED IN PART and DENIED IN PART**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on September 6, 2024.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies To: Counsel of Record

49